IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DUBACH, INC.**, a California corporation, and **M.L. DUBACH**, individually, | ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| v. | ) ) | Case No. CIV 05-050-JHP |
| **LUCKY ACE PETROLEUM, L.L.C.,** an Oklahoma limited liability company, **EARL EDMONDS**, individually and d/b/a Lucky Ace Petroleum, and **OMEGA TRADING, L.L.C.**, a Minnesota limited liability company, d/b/a Lucky Ace Petroleum, | ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## ORDER and OPINION

Now before the Court are Defendants' Motion for Partial Summary Judgment, Plaintiffs' Response in opposition, and Defendants' Reply thereto. Defendants seek summary judgment on all claims relating to fraud. For the reasons stated herein, Defendants' Motion is DENIED.

## Background

Plaintiffs allege that Defendant Lucky Ace and non-party RMJ Development[1] were joint venturers in the field of oil and gas development. RMJ was the "retail arm" of the venture, while Lucky Ace was the operational branch. As the "retailer," RMJ sought investors, such as Plaintiffs, to fund oil and gas projects undertaken by Lucky Ace. RMJ offered Net Revenue Interests (NRI) to its investors, as was reflected in certain of RMJ's marketing literature and in

---

[1] Plaintiffs originally brought suit against RMJ, Lucky Ace, and the individuals associated with each entity. Plaintiffs have since settled with RMJ and its principals, and RMJ has dismissed its cross-claims against Lucky Ace.

its Asset Purchase Agreements (APA) which memorialized any sales. The APA specifically noted that the investor agreed to purchase NRIs from RMJ, which was consistent with RMJ's practice of securing the investment, taking its commission, and investing the remainder in Lucky Ace projects.[2]

Plaintiffs entered into multiple APAs with RMJ. Plaintiffs' total investment was $452,344.50, plus a loan in the amount of $18,000. With respect to each of the APA properties, Plaintiffs were told how their investment monies would be used. To the extent that these monies may or may not have been used for the stated purposes, Plaintiffs have claimed fraud.[3] The APAs also stated that RMJ would make assignments and issue Joint Operating Agreements for Plaintiffs' subscribed interests, which RMJ (and/or Lucky Ace) did not do. Plaintiffs also complain that they have never received the anticipated return on their investment, despite representations of a 2.6 month payout, and claim fraud on this account as well.

---

[2]Other financial details were not spelled out in the APAs or elsewhere. For example, RMJ's commission is not disclosed. Further, on paper, Lucky Ace was not a party to the APA, but merely its beneficiary. The nature of the relationship between Lucky Ace and RMJ, however, is a question of fact for the jury to decide.

[3]Plaintiffs complain that ". . . it was represented by [RMJ], as a partner of Lucky Ace, that these funds were to be used to purchase **working interests** in oil and gas leases and to drill or recomplete wells in said leases . . . ." [Second Am. Compl. at 8, ¶ 23 (emphasis added).] Elsewhere, however, Plaintiffs refer to their interests as NRIs. Moreover, the APA very clearly states that Plaintiffs purchased NRIs. The distinction is important, because NRIs are paid out after all burdens have been deducted from the working interests. *See* 8-N Williams & Myers, Oil & Gas Law 90; *see also* Oilfield Glossary, *available at* http://www.glossary.oilfield.slb.com. Thus, NRI holders do not necessarily have any input into how their investment dollars are spent. Further, if a project does not produce revenue in excess of costs, there will be no NRI to distribute. Here, two projects are admitted to be dry holes, and two more are described as marginal producers. Plaintiffs have received some payout from those projects. To the extent that these payments did not meet Plaintiffs' expectations, however, such risk is inherent in this type of investment, which Plaintiffs, as sophisticated investors, surely understood at the onset.

In detailing their fraud claims, Plaintiffs attribute very few specific acts to Defendants.[4] First, Plaintiffs discuss an "invitation" from RMJ which refers to "our Petroleum Geologist, Earl Edmonds," which Plaintiffs believe evidences the joint venture between RMJ and Lucky Ace. [Second Am. Compl. at 10-11, ¶ 35.] Second, Plaintiffs note that Earl Edmonds opened and used a bank account in the name of "Lucky Ace Petroleum, L.L.C. and RMJ Joint Venture." [Id. at 11, ¶ 36.] Third, Plaintiffs refer to a certificate issued to them by RMJ which states "Lucky Ace Petroleum and RMJ Development hereby assigns [*sic*] the NRI ownership . . . to the holder of this NRI . . . ." and which Plaintiffs believe shows Defendants' intent to "impress Plaintiffs of [their] ownership in the subject property." [Id. at 11-12, ¶ 37]. Fourth, Plaintiffs allege that Earl Edmonds traveled to California with representatives of RMJ to meet with and solicit Plaintiffs, and that another "invitation" was delivered during this meeting, as was a sample report from a waterflood project similar to the project being pitched .[5] [Id. at 12-14, ¶¶ 39-40.] Fifth, Plaintiffs refer to a document delivered by RMJ containing an attachment prepared by Earl Edmonds which describes an investment opportunity as a "perfect trap" and "perfect location" for

---

[4]Indeed, if the jury finds that Lucky Ace and RMJ were **not** joint venturers, the Court doubts whether Plaintiffs' fraud claim can survive based solely upon the acts of these Defendants.

[5]Plaintiffs clearly identify the sample report as a document entitled "**Holdenville** Field Booch Sand Waterflood Prospect Project Evaluation **April 2001**," and are equally clear that this document was given to them in **October 2002** to "evidence what Defendants were **going to do** to create the **Grace** waterflood." [Second Am. Compl. at 13-14, ¶ 40 (emphasis added).] In other words, Plaintiffs specifically note that the projects have different names (*i.e.*, Holdenville versus Grace) and different time frames (*i.e.*, April 2001 versus sometime after October 2002), yet go on to feign complete bewilderment that, "unknown to [them]," the report dealt with a completely different property.

3

drilling.[6] [Id. at 14, ¶ 41.] Sixth, Plaintiffs allege that Earl Edmonds and Lucky Ace used some of their investment dollars on a different project. [Id. at 14-15, ¶ 41.] Finally, Plaintiffs complain that Earl Edmonds told them that Lucky Ace lacked money for a particular task, which induced Plaintiffs to loan the project $18,000. [Id. at 15, ¶ 42.] Plaintiffs wrote the check to RMJ and received a loan agreement signed by RMJ representatives, which stated that "profit due [Lucky Ace]/RMJ will be paid to [Plaintiffs] until the [loan] is paid." [Id.] Plaintiffs admit, however, that the vast amount of their dealings were with RMJ, that all money passed through RMJ, and that all written contracts entered into during these proceedings were between Plaintiffs and RMJ.

## Discussion

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. Id. at 249. The presence of a genuine issue of material fact defeats the motion.

In making the summary judgment determination, the Court examines the factual record and draws reasonable inferences therefrom in the light most favorable to the non-moving party.

---

[6]Again, Plaintiffs' pleadings are somewhat disingenuous. With regard to the attachment, Plaintiffs assert that it was "false and misleading, as there is no such thing as a 'perfect trap' or 'perfect location' in which to drill." [Second Am. Compl. at 14, ¶ 41.] As sophisticated investors, Plaintiffs should recognize advertising hyperbole, or "puffing," when they see it.

4

Simms v. Oklahoma, 165 F.3d 1321, 1326 (10th Cir. 1999). The Court also interprets the rule in such a way as to isolate and dispose of factually unsupportable claims or defenses. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment is also appropriate if any element of the prima facie case lacks sufficient evidence to require submission to a jury. Anderson v. Liberty Lobby, 477 U.S. at 248-49.

### I. Plaintiffs have adequately pled fraud damages.

Defendants here move for summary judgment on Plaintiffs' fraud claims on grounds that there are no net revenues to distribute, and thus, no damages to which Plaintiffs are entitled. Defendants argue that, "[i]n order to have a claim for net revenue payments which claim is ripe for adjudication, there must have been production sufficient to give rise to net revenues as an essential predicate to the claim." [Def. Mtn. at 7.] While this statement may be perfectly reasonable on its face, it is not dispositive of Plaintiffs' claim. Under Oklahoma law, "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." 76 Okla. Stat. § 2.[7] Thus, if Plaintiffs'

---

[7]The Court also notes that actual fraud is always a jury question in Oklahoma. 15 Okla. Stat. § 60. Actual fraud "consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true.
2. The positive assertion in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true.
3. The suppression of that which is true, by one having knowledge or belief of the fact.
4. A promise made without any intention of performing it; or,
5. Any other act fitted to deceive."

Id. § 58. In contrast, constructive fraud consists "[i]n any breach of duty which, without an

investments were procured by Defendants' fraud, the damage Plaintiffs suffered would be measured by the sums they invested. Defendants are therefore not entitled to summary judgment on this basis.

## II. Plaintiffs' claim under the Oklahoma Consumer Protection Act is proper.

Defendants maintain that the absence of damages is also fatal to Plaintiffs' claim under the Oklahoma Consumer Protection Act. In the alternative, Defendants argue that the transaction at issue in this case does not fall within the established scope of the Act, such that Defendants are entitled to summary judgment. The Act governs "the advertising, offering for sale or purchase, sale, purchase, or distribution of any services or property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever located, for purposes that are personal, household, or business oriented." 15 Okla. Stat. § 752(2). However, the Act expressly excepts "transactions regulated under laws administered by the Corporation Commission." Id. § 754(2). Defendants here claim that the Corporation Commission has jurisdiction over the subject transaction, such that the exception applies.

It is axiomatic that the Corporation Commission shall regulate the waste of oil and gas resources and protect the correlative rights of oil and gas owners. *See, e.g.*, Tenneco Oil Co. v. El Paso Natural Gas Co., 687 P.2d 1049, 1052 (Okla.1984). Despite the public interest inherent in oil and gas transactions, however, it is also clear that certain related matters are "proper matters for private contracts," and that disputes arising therefrom are to be determined by the

---

actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or, [. . .i]n any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud." Id. § 59.

district court.  Id. at 1053.  Seemingly, private interests alone, and not correlative rights, are at issue here.

Correlative rights are defined as "a convenient method of indicating that each owner of land in a common source of supply of oil and gas has legal privileges as against other owners of land therein to take oil and gas therefrom by lawful operations conducted on his own land, limited, however, by duties to other owners not to injure the source of supply and by duties not to take an undue proportion of the oil and gas."  United Petroleum Exploration, Inc. v. Premier Resources, Ltd., 511 F. Supp. 127, 129 (W.D. Okla. 1980) (quoting Kingwood Oil Co. v. Corporation Commission, 396 P.2d 1008, 1010 (Okla. 1968).  In other words, correlative rights are those rights which one owner possesses in a common source of supply – *i.e.*, "the underlying geological strata," and not merely the well or the project – in relation to the same rights possessed by other owners in the same common source of supply.  Id.  Because Plaintiffs here have no interest in the leaseholds at issue, nor any rights to drill themselves for oil and gas on the properties, but merely some interest in the projects' revenue (if, in fact, any profit is realized), Plaintiffs do not have any correlative rights subject to the protection of the Corporation Commission.  Thus, the exception to the Consumer Protection Act does not apply, and summary judgment on Plaintiffs' claim under the Act is therefore inappropriate.

### III.  A genuine issue of material fact precludes summary judgment on the existence of a joint venture.

Defendants also argue that they cannot be held liable for any fraud perpetrated on Plaintiffs by RMJ because no joint venture existed.  "The requirements of a joint venture are '(1) a joint interest in property, (2) an express or implied agreement to share profits and losses of the venture and (3) action or conduct showing cooperation in the project.'"  Sperling v. Marler, 963

7

P.2d 577, 582 (Okla. 1998) (quoting Martin v. Chapel, Wilkinson, Riggs & Abney, 637 P.2d 81, 85 (Okla. 1981)). In disclaiming the joint venture, Defendants deny that RMJ stood to share in the projects' losses, and also deny that RMJ held a joint interest in the properties at issue.[8]

An agreement to share profits and losses may be express or implied. Martin, 637 P.2d at 85. Here, the parties seemingly did not have an express agreement. RMJ was entitled to a percentage off the top of any investment it secured, and held NRIs and/or working interests in the projects at issue. To the extent that RMJ held such interests, it was sharing in the profits. *Cf.* Cimarron Oil & Gas, Inc. v. Benson-McCown & Co., 806 P.2d 83, 85 (Okla. Civ. App. 1989) (finding no agreement to share profits where party was entitled to management fee and amount equal to owner's NRI, but had no actual interest in the lease). Yet, RMJ had little, if any, exposure if the projects did not produce. RMJ did not invest any of its own money into the projects. Of course, losses can be measured in non-monetary terms – such as lost time and effort. For example, had RMJ agreed to provide its services "solely in return for a share of expected profits, it could be seen that [it] stood to share in the losses of the enterprise as well as

---

[8] Defendants make much of the fact that RMJ did not have a joint **ownership** interest in the properties. However, neither ownership nor actual, tangible property is required to establish a "joint interest." *See* Cimarron Oil & Gas, 806 P.2d at 84 (citing Oklahoma Co. v. O'Neil, 440 P.2d 978 (Okla. 1968) for the proposition that joint venturers must have a joint interest in the particular **project** involved); *see also* Crest Constr. Co., 417 F. Supp. at 569 (finding a joint interest where parties are "engaged in an enterprise in which they have a community of interest and a common purpose in its performance"). In order to demonstrate a joint interest, the parties must combine "their property, capital, materials, money, efforts, skill, services, or knowledge in the undertaking." 48 C.J.S. *Joint Adventures* § 12 (cmt.). The parties' contributions need not be equal in character or proportion "so long as each joint venturer contributes something to the motive of the enterprise." Id.; *see also* Martin, 637 P.2d at 85 (each party must contribute "something promotive of the enterprise"). Because Lucky Ace and RMJ were clearly interacting on some level on these oil and gas development projects, and engaging in cooperative acts, their "joint interest" is sufficiently established.

its profits." *See* Crest Constr. Co. v. Ins. Co. of N. Am., 417 F. Supp. 564, 568 (W.D. Okla. 1976). Thus, depending on the degree of RMJ's involvement, an agreement to share losses could be inferred here.

In sum, as to third parties, such as Plaintiffs here, "it is the intent to do those things which constitutes a joint venture that usually determines whether the relation exists." Martin, 637 P.2d at 86. The legal intent controls, rather than the actual intent, such that alleged joint venturers "may be estopped in favor of third persons from denying that they are joint venturers, even though they never intended to become such." Id. Thus, because the nature of the relationship between Lucky Ace and RMJ is unclear, summary judgment on the existence of a joint venture is precluded.

## **Conclusion**

For the reasons stated herein, Defendants' Motion for Partial Summary Judgment is DENIED, and the issue of fraud remains for the jury to decide.

IT IS SO ORDERED this 11th day of July 2006.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma